## UNITED STATES v. TOZER.

*(Circuit Court, E. D. Missouri, N. D. September 30, 1889.)*

1. **CARRIERS—INTERSTATE COMMERCE ACT—CARRIAGE FOR SAME PERSON.**

   A grocery company of Hannibal, Mo., ordered a broker in Chicago to ship two barrels of sugar to a customer in Hepler, Kan. This order was executed by shipping the sugar over the C., B. & Q. R. Co. A through bill of lading was taken in the name of the broker, with the customer indicated as consignee, which reserved to the C., B. & Q. Co. the right to forward the property from Hannibal, Mo., over the line of any connecting carrier. At the latter place the sugar was unloaded, placed in the warehouse of the Mo. Pac. Ry. Co., and thence loaded on its cars, and carried to Hepler, where the total freight charges, at the rate of 51 cents per hundred, were paid by the consignee. Of this rate 34 cents per hundred only were retained for the Mo. Pac. Ry. Co. The Mo. Pac. Ry. and the C., B. & Q. Co. had a standing arrangement by which rates were fixed from Chicago to points on the Missouri Pacific's line, by adding an arbitrary sum—five cents—to the rate from Hannibal to such points. On the same day, the grocery company sold to the same customer one barrel of sugar, and shipped it over the Mo. Pacific's road from Hannibal to Hepler, and paid the freight charges in advance, which were at the rate of 46 cents per hundred. *Held*, that the two services were not rendered for one and the same party in such sense that there could be no undue discrimination, within the meaning of the interstate commerce act.

2. **SAME—DISCRIMINATION IN RATES—SECTION 3.**

   Section 3 of the interstate commerce act, which declares it to be unlawful for a carrier to give "an undue or unreasonable preference" to any person, firm, corporation, or locality, or to subject any person, etc., to any undue or unreasonable prejudice or disadvantage "in any respect whatsoever," does not refer solely to facilities afforded to shippers, but applies also to discrimination in rates.

3. **SAME—ADJUSTMENT OF THROUGH RATES.**

   Congress did not intend to leave carriers the power to grant undue preferences, or to subject persons or places to undue disadvantages, by any devices, or by any adjustment of joint through rates with relation to local rates. When two carriers establish a joint through rate, the proportion thereof that one carrier receives for carriage of property between two points on its line may be compared with its local rates between the same points, for the purpose of establishing that an unreasonable preference has been given, or that a shipper has been subjected to an undue disadvantage.

4. **SAME—PROVINCE OF JURY.**

   Whether the difference between such local rate and the proportion of a joint through rate is reasonable or unreasonable, is a question of fact for the jury.

Indictment for Violation of Interstate Commerce Act. On motion for new trial and in arrest of judgment.

*George D. Reynolds*, U. S. Atty., and *Charles Claflin Allen*, for plaintiff.

*Thomas J. Portis* and *Aldace F. Walker*, for defendant.

THAYER, J. The defendant having been convicted on the second and third counts of the indictment, for violation of the third section of the interstate commerce act, forbidding unreasonable preferences, etc., (39 Fed. Rep. 369,) the case is again before the court, on a motion in arrest of judgment and for a new trial.

The first point demanding consideration is one made by defendant's counsel to the effect that no preference was given in the present case, and that no person or corporation was subjected to an undue disadvantage,

because the Hayward Grocery Company, the complainant, made both shipments in question,—that is to say, the one from Chicago to Hepler, Kan., and the one from Hannibal, Mo., to the same point. It is said that, inasmuch as both services were rendered for the same person, it cannot be said that any preference or discrimination within the meaning of the law was shown. Undoubtedly the point is well taken if the service in each instance was rendered for the same party. The facts, as developed by the testimony, are that the Hayward Grocery Company, in June, 1887, ordered Randall & Fowler to ship two barrels of sugar from Chicago, Ill., to John Viets, at Hepler, Kan., who appears to have been a customer of the grocery company. Randall & Fowler were merchandise brokers. They executed the order by buying and shipping the sugar over the Chicago, Burlington & Quincy Railroad, taking therefor a bill of lading in their own name as consignors. Under the head of "Marks and Consignees" was written "John Viets, Hepler, Kan.," and underneath that the following words appear where rates are usually specified: "From Chicago to Hepler—Tariff." Across the face of the bill of lading was stamped a notice to the effect that the Chicago, Burlington & Quincy Railroad Company expressly reserved the right to forward the property from the terminus of its own road by the road of any connecting carrier whom it might select. At Hannibal, Mo., it selected the Missouri Pacific Railway to complete the carriage to the point of destination. The sugar was there unloaded, placed in the warehouse of the Missouri Pacific Railway Company, and thence loaded into one of its cars on June 15, 1887, and carried forward by the latter company to Hepler. The total freight charge from Chicago to Hepler, Kan., was paid to the Missouri Pacific Railway Company, on the arrival of the property, by John Viets, the consignee, the rate being 51 cents per hundred, and of this sum the defendant Tozer, as agent of the Missouri Pacific Railway Company, advanced to the Chicago, Burlington & Quincy Railroad Company its proportion, on receipt of the property at Hannibal, Mo. The Chicago, Burlington & Quincy Railroad Company and the Missouri Pacific Railway Company had a standing arrangement in force at the time of this transaction, whereby the rate on sugar and fourth-class freight from Chicago, Ill., to points on the Missouri Pacific's road in Kansas, Nebraska, and the Indian Territory, via the Chicago, Burlington & Quincy Railroad, the town of Hannibal, and the Missouri Pacific Railway, was to be ascertained and fixed by adding to the established rate from Hannibal to such points an arbitrary sum, to-wit, five cents per hundred. The rate from Hannibal to Hepler, Kan., over the Missouri Pacific Railway, on shipments originating at Hannibal, was 46 cents per hundred on sugar, in June, 1887. On the shipment made from Chicago by Randall & Fowler to John Viets, the consignee accordingly paid a rate of 51 cents per hundred. Of this sum the Missouri Pacific Railway Company retained, as it appears, 34 cents only, and accounted to the Chicago, Burlington & Quincy for 17 cents per hundred of the alleged joint or through rate. The other shipment that figures in this controversy was made by the Hayward Grocery Company at Hannibal, on June 17, 1887. On that day the

grocery company sold and shipped one barrel of sugar to John Viets, at Hepler, Kan., over the Missouri Pacific Railway, and paid the freight charges in advance. For the latter service the defendant, as agent of the railway company, charged the grocery company at the rate of 46 cents per hundred from Hannibal to Hepler.

On this state of facts the court is of the opinion that the two services were not rendered for one and the same party, in such sense that there could be no preference or discrimination within the meaning of the law. The bill of lading, as the court construes it, was a through bill of lading, and bound the Chicago, Burlington & Quincy Railroad Company to carry the property through to the point of destination at tariff rates,— that is to say, at 51 cents per hundred. The service rendered by the Missouri Pacific Railway Company as to the Chicago shipment was a service rendered for the Chicago, Burlington & Quincy Railroad Company, to enable it to complete its contract of affreightment. On delivery of the sugar to the Chicago, Burlington & Quincy Railroad Company, at Chicago, title vested in the purchaser or consignee; subject, of course, to the right of stoppage *in transitu*, in case of the insolvency of the consignee before actual delivery. Indeed it does not appear that the Hayward Grocery Company was at all interested in the through rate made by the Chicago, Burlington & Quincy Railroad Company on that shipment, as the freight was to be paid at the point of destination by the purchaser, and it was so paid. The other service rendered in connection with the shipment originating at Hannibal was a service rendered for the grocery company, as it both employed the carrier and paid for the service to be rendered in advance. There was ample evidence, in the opinion of the court, to support the charge laid in the second and third counts of the indictment, that the defendant charged 46 cents per hundred for a service rendered the grocery company, and a less compensation for a service rendered the Chicago, Burlington & Quincy Railroad Company. In no aspect of the case can the two carriers be regarded as joint contractors with the grocery company for the transportation for it of two barrels of sugar from Chicago to Hepler. The Chicago, Burlington & Quincy Railroad Company either employed the Missouri Pacific Railway to carry out a contract for through carriage, which it had undertaken, or in the matter of engaging the services of the Missouri Pacific Railway Company it acted as agent for the consignee of the goods, and it appears to the court to be immaterial, so far as this case is concerned, in which of the two capacities it acted.

It is next insisted that section 3 of the interstate commerce act relates and has reference solely to facilities afforded to shippers, and not to rates, and that no discrimination in rates will constitute an undue "preference or disadvantage" within the meaning of the law. This point was raised, considered, and overruled at the trial, and it seems hardly necessary to enter upon a discussion of that question again. The intent of the lawmaker in this section of the act seems clear enough. It is declared to be unlawful for a carrier to give "an undue or unreasonable preference" to any person, firm, corporation, or locality, or to subject any person, firm,

corporation, or locality to any undue or unreasonable prejudice or disadvantage "in any respect whatsoever." After such emphatic language declaring that a preference given in any respect whatsoever shall be unlawful, it seems obvious that courts are not authorized by any principle of construction to create an exception by saying that an undue preference given in the matter of rates shall not be deemed unlawful, or that, if a shipper is put to an unreasonable disadvantage merely in the matter of rates, he shall not be esteemed to have any right of redress under the third section. But this question has been practically settled by judicial determination of the meaning of the English statute, from which the third section of the interstate commerce act was borrowed. The second section of the English "railway and canal traffic act" of 1854, prohibits undue and unreasonable preferences, and also prohibits railway companies from subjecting persons to any undue or unreasonable prejudice or disadvantage. The settled construction of that act appears to be that the prohibitions in question include preferences in rates, as well as in facilities. *Colliery Co.* v. *Railway Co.*, 3 Nev. & McN. 426; *Denaby* v. *Railway Co.*, L. R. 11 App. Cas. 97; Harp. Int. St. Com. 66–68, and cases cited.

Very similar to the point last considered is the proposition urged for the first time on the hearing of the motion for a new trial, that no disparity existing between the rate charged on the shipment originating at Hannibal and the Missouri Pacific's proportion of the rate on the Chicago shipment can be alleged as a preference or discrimination, and hence as a violation of the third section of the act. It is said that, the one rate having been fixed by the Missouri Pacific Railway Company, alone, between stations on its own line, and the other being its proportion of a joint rate, the law does not allow any comparison between the two rates for the purpose of establishing a preference; and, further, that the public is in nowise concerned in the division of the joint rate as between the connecting carriers. With reference to such contention it will suffice to say that, as the third section of the act *ex industria* prohibits preferences and discriminations "in any respect whatsoever," it appears to the court that the proposition above stated is not tenable, unless it be a fact that no adjustment of joint through rates with respect to other rates over the lines of the connecting carriers can operate as an undue preference, or as an unreasonable discrimination against persons and places. If joint through rates may be, and are, so adjusted with reference to other rates established by the connecting carriers as to operate as a preference or discrimination against persons and places, and such adjustment is unreasonable,—that is to say, is not justified by the circumstances of the case,—a carrier concerned in making such joint rate, by receiving the portion of the same allotted to him, may be guilty of a violation of the third section. The decision of the interstate commerce commission in the case of *Chamber of Commerce* v. *Railroad Co.*, 2 Int. St. Com. R. 570, 571, proceeded clearly on the assumption that the rates charged from Milwaukee to the seaboard by the roads east of Milwaukee, on shipments originating at Milwaukee, might be a discrimina-

tion against shippers residing in the latter city, and a violation of the third section, by reason of the disparity between that rate and the percentage of the joint through rate from Minneapolis to the seaboard, which those roads accepted for the haul east of Milwaukee. It is true that in that case no discrimination was found to exist as a matter of fact, the commission holding that the difference of 2½ cents per hundred was not, under the circumstances, unreasonable. It seems evident to the court that it is within the power of the Missouri Pacific Railway Company and other carriers to unite with roads east of the Mississippi river in establishing joint rates from Chicago to points in Kansas, Arkansas, Nebraska, the Indian Territory, and Texas, which, by virtue of their unfair relation to the rates established from St. Louis, Hannibal, and other places to such points in the west and south-west, on shipments originating at St. Louis and Hannibal, would operate as an unreasonable discrimination against the latter cities, and as a serious impediment to their trade and commerce. I would not be understood by what is last said as intimating that in the opinion of the court such unfair joint rates have been already made, or that the testimony in this case establishes such fact. On that point I express no opinion. I mention the matter merely in illustration of the point that carriers clearly have it in their power to so adjust joint rates, with respect to other rates, as to operate both as an unreasonable preference given to persons and places, and as an undue discrimination against persons and places. Such grievances, if they in fact existed, could not be redressed under the second section of the act, because the services would not be rendered under "substantially similar circumstances and conditions;" and there might be no redress under the fourth section of the act, because the long and short haul clause would not necessarily be violated. If that kind of preferences and discriminations are not in violation of the third section, then such acts cannot be punished in a criminal proceeding. The court is of the opinion that congress did not intend to leave carriers the power to grant undue preferences by any devices, or the power to subject persons or localities to undue disadvantages by any adjustment of joint rates, without being liable to criminal prosecution under the act. It accordingly holds that the public has some concern in the division of joint rates as between carriers, and that an adjustment of joint rates, with respect to other rates established by the connecting carriers, may furnish adequate ground for a prosecution under the third section.

After a careful review of all the points urged in support of the motions, the court is of the opinion that no substantial error prejudicial to the defendant was committed by the court at the trial. If the defendant has any reason to complain, it is of the action of the jury in finding that there was an unreasonable disparity between the rate charged on the Hannibal shipment and the proportion accepted of the joint rate from Chicago. Whether the difference shown in the two rates was reasonable or unreasonable was certainly a question of fact for the jury, in the light of all the circumstances, and not a question of law for the court. *Diphwys* v. *Railway Co.*, 2 Nev. & McN. 73; *Denaby* v. *Railway Co.*,

*supra.* And if it be true, as suggested, that the selfishness of men is such that juries will declare any difference in rates to be unreasonable that operates to the disadvantage, or is supposed to operate to the disadvantage, of themselves or the community to which they belong, that is obviously a criticism of the law, and merely proves that questions of fact such as were tried in this case, which certainly demand for their solution special knowledge, and above all impartial consideration, ought to be submitted to some other tribunal than a jury of the locality where the alleged grievances exist. The motions are overruled.